**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **DORINDA S. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00370** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Dorinda S. Smith appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1]  For the following reasons, the Commissioner's

decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Smith applied for DIB and SSI in October 2008, alleging disability from March 1, 2005.

(Tr. 32, 167-76.)  Her claim was denied initially and upon reconsideration (Tr. 103-10, 112-17,

and Smith requested an administrative hearing (Tr. 118-19).  Administrative Law Judge ("ALJ")

Terry Miller conducted a hearing on July 2, 2010, at which Smith, who was represented by

counsel; Smith's mother; and a vocational expert ("VE") testified.  (Tr. 32, 53-98.)

On September 27, 2010, the ALJ rendered an unfavorable decision to Smith, concluding

---

[1] All parties have consented to the Magistrate Judge.  (Docket # 11); *see* 28 U.S.C. § 636(c).

that she was not disabled because she could perform her past relevant work as a hand packager and a significant number of other unskilled jobs in the national economy.  (Tr. 32-46.)  The Appeals Council denied Smith's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-28.)

Smith filed a complaint with this Court on October 25, 2011, seeking relief from the Commissioner's final decision.  (Docket # 1.)  Smith's sole argument on appeal is that the ALJ improperly evaluated the opinion of Karen Lothamer, a clinical nurse specialist at Park Center.  (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17-21.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Smith was thirty years old (*see* Tr. 45-46, 58, 167), had a high school education (Tr. 61, 203), and possessed work experience as a hand packager, food server, EMT-Paramedic, certified nursing assistant, and small products assembler (Tr. 275; *see* Tr. 66-67).  She alleges that she became disabled as of March 1, 2005, due to major depressive disorder, bipolar disorder, and panic disorder.  (Opening Br. 2.)

### B.  Smith's Testimony at the Hearing

At the hearing, Smith testified that she lives in a mobile home with her "therapy" dog,[3] which she has had for four and a half years.  (Tr. 59-61.)  In 2005, Smith worked full-time caring for nursing home residents and then part-time as a home care worker.  (Tr. 63-64.)  She stated that both of these were short-term jobs that ended because she called in sick too much.  (Tr. 64.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 607-page administrative record necessary to the decision.

[3] Smith's mother testified that the dog was not a trained therapy animal.  (Tr. 91.)

Her last job was doing seasonal work from August 2007 to March 2008 at Grabill Country Meats, where she worked eight hours a day, three days a week as a packager, until she was laid off, purportedly because she was no longer needed.  (Tr. 64-65.)  Smith believes the real reason was her panic attacks, which caused her to miss work a few times.  (Tr. 65-66.)

Smith's diagnoses are bipolar disorder, panic attacks, anxiety, and depression.  (Tr. 68.) Her bipolar disorder consists of periods of both mania and depression, but mostly depression. (Tr. 68-69.)  When she is depressed, she does not feel like doing anything and will lay on the couch a lot and cry.  (Tr. 69-70.)  These periods last for a week, sometimes two, and occur about every other month.  (Tr. 84.)  Smith stated that during a depressive period, she would have to miss work at least part of, if not the whole, time.  (Tr. 84-85.)  During her manic periods, which occur about two or three times a year and last for two to four days, she feels great and will spend a lot of money, talk about nonsensical stuff, and call people on the phone that she normally would not call; when she worked during these periods in the past, she could not focus on her work and talked too much.  (Tr. 68-69, 85.)  Smith further reported that she has had panic attacks, during which her heart beats really fast and she feels like she is going to die, since she was six years old.  (Tr. 70, 73.)  She stated that she has an average of two to three panic attacks a day and has had up to eight or nine at a time; it takes her ten to twenty minutes to recover.  (Tr. 72.)  Her dog alleviates the severity of these attacks.  (Tr. 70, 74.)

Smith was first treated at Park Center in November 2005 and has seen Karen Lothamer there since 2008.  (Tr. 71.)  The two discuss how Smith is doing on her medications, which include Abilify for bipolar disorder, Klonopin for panic attacks, Zoloft for depression, and Trazodone for sleeping.  (Tr. 71-72.)  Smith stated that she has requested a therapist, but is still

waiting to hear back about it.  (Tr. 83.)

As for Smith's daily living activities, she reported having no friends, but that she occasionally goes out with her mother and sister; she is able to drive and can run errands by herself.  (Tr. 60, 73-74.)  She denied smoking and stated that she had not drank alcohol for almost a year, but admitted that she had previously used marijuana and overused Vicodin.  (Tr. 74-76.)  When Klonopin does not work during a really bad panic attack, Smith sometimes calls a friend who will bring her free marijuana; this reportedly happens "rarely."  (Tr. 75-76.)  Smith likes to read, listen to books on tape, watch soap operas, walk her dog, and go swimming during the summer; she can remember all of the details and plot lines in her soap operas and does not have any problems concentrating to read a book unless she has a panic attack.  (Tr. 77-79, 83.) Smith has no problems taking care of her personal needs; she dresses and bathes herself regularly, feeds herself, goes grocery shopping, and does laundry.[4]  (Tr. 80-81.)

### C.  Summary of the Relevant Medical Evidence

Between January 2004 and December 2005, Smith was treated by Dr. Jerry Dearth, a primary care practitioner.  (*See* Tr. 309-72.)  During this period, Dr. Dearth diagnosed Smith with panic attacks and depression (Tr. 367) and prescribed several medications to treat these conditions (Tr. 309-13, 315, 317-19, 326-27, 340-41, 345, 348-50, 357-58, 363-65, 372).

In November 2005, Smith was evaluated at Park Center after testing positive for marijuana.  (Tr. 377-84.)  During the assessment, Smith reported a history of psychiatric illness and alcohol dependence.  (Tr. 377.)  She admitted to smoking marijuana to alleviate severe knee pain from a prior accident, but insisted that she had used marijuana only a couple of times

---

[4] Smith's mother also testified at the hearing and essentially corroborated Smith's testimony.  (Tr. 86-91.)

4

before.  (Tr. 377.)  She was diagnosed with alcohol dependence; major depressive disorder, recurrent and mild; and rule out bipolar disorder, NOS; and assigned a Global Assessment of Functioning ("GAF") score of 60.[5]  (Tr. 383.)

A Park Center treatment plan completed the following month contains the same diagnoses (except Smith's bipolar diagnosis was no longer "rule out") and GAF score.  (Tr. 374.) Smith's problems were noted as her recent marijuana use and bad panic attacks.  (Tr. 374-75.)

According to the record, Smith next received psychiatric treatment over two years later, in April 2008, when she was brought to the emergency room due to "abnormal behavior."  (Tr. 390; *see* Tr. 390-92, 400-15.)  She was diagnosed with a manic episode with psychosis and was transferred to Parkview Behavioral Health.  (Tr. 391.)  Once admitted there, Smith reported that she had not slept for four days, was anxious and irritable, heard God talking to her, and could sometimes predict the future.  (Tr. 407, 410.)  She denied any suicidal ideation or any auditory or visual hallucinations, but indicated that she had panic attacks since she was six or seven.  (Tr. 407.)  She further stated that she was addicted to marijuana, which she used to alleviate her panic attacks, and alcohol, but had not drank for seven months.  (Tr. 407-08, 410.)  Smith was diagnosed with bipolar disorder, manic; panic disorder without agoraphobia; alcohol dependence, in remission; and cannabis abuse and assigned a GAF of 30.  (Tr. 408-09.)  After

---

[5] GAF scores reflect a clinician's judgment about the individual's overall level of functioning.  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id.*  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

three days of inpatient hospitalization, Smith's manic state seemed to have resolved, and she was discharged. (Tr. 400, 402.) At discharge, her GAF score had increased to 50. (Tr. 401.) Smith was referred to Park Center for medication assistance and drug and alcohol treatment. (Tr. 402.)

Smith was evaluated at Park Center a couple of days later. (Tr. 520-25.) On mental status exam, her behavior was overactive, her judgment was poor, her speech was pressured, and she was unable to stay on task. (Tr. 520.) Smith was diagnosed with bipolar I disorder, most recent episode manic, severe with psychotic features; panic disorder without agoraphobia; alcohol dependence; and cannabis dependence and assigned a GAF of 30. (Tr. 523.)

In May 2008, Smith saw Karen Lothamer, a psychiatric clinical nurse specialist at Park Center, for a fifteen-minute appointment. (Tr. 513.) On mental status exam, Ms. Lothamer observed that Smith's mood was appropriate and elated, her speech was pressured, and her thought form was coherent, but tangential; her findings were otherwise normal. (Tr. 513-14.) Ms. Lothamer noted that Smith's treatment response was improved. (Tr. 515.)

Three months later, in August 2008, Smith was brought to the emergency room after she was found non-responsive near a partially filled bottle of alcohol. (Tr. 416, 422.) She also tested positive for marijuana. (Tr. 417.) Smith was diagnosed with acute alcohol intoxication and bipolar disorder with history of psychosis and discharged the next day. (Tr. 417-18.)

In October 2008, Smith saw Ms. Lothamer for a ten-minute medication management review. (Tr. 499.) Smith's mental status exam was normal except that she was staring and her affect was flat. (Tr. 500.) Smith reported that her anxiety had returned after beginning a new medication; Ms. Lothamer noted that Smith had not exactly understood the directions, continued

her on the medication, and found her treatment response improved. (Tr. 500.) The following month, Ms. Lothamer wrote a letter opining that Smith was psychiatrically disabled. (Tr. 498.) Later in November, Smith arrived at Park Center as a walk-in, reporting that, for the past couple of weeks, she had been depressed, wanted to lie around all the time, and had no motivation and a decreased appetite. (Tr. 496.) Her medication was adjusted. (Tr. 497.)

In January 2009, Smith had a ten-minute medication management appointment with Ms. Lothamer, reporting that she was anxious and having panic attacks. (Tr. 489.) Ms. Lothamer adjusted her medications and offered therapy for relaxation, to which Smith agreed. (Tr. 489.) The only notable findings on mental status exam were an anxious mood and flat affect. (Tr. 489-91.) Ms. Lothamer opined that Smith was "slightly better." (Tr. 491.) In a treatment plan completed this same month, Smith's diagnoses were unchanged, but her current GAF score increased to a 55. (Tr. 485.)

Also in January 2009, Wayne J. Von Bargen, Ph.D, performed a mental status examination of Smith at the request of the state agency. (Tr. 440-42.) Dr. Von Bargen noted that Smith was cooperative throughout the interview; her responses were logical, relevant, and coherent; and her affect was appropriate. (Tr. 440.) She reported experiencing panic attacks at least once a day, that she was a binge-drinker, and that she used to smoke marijuana every day, but could not currently get any because she did not have a job. (Tr. 440-41.) Dr. Von Bargen concluded that her cognitive functioning appeared to be grossly intact and that she was probably capable of managing her own funds. (Tr. 442.) He diagnosed her with bipolar I disorder, depressed; panic disorder without agoraphobia; alcohol abuse; and cannabis abuse and assigned her a GAF score of 50. (Tr. 442.)

Later on that month, Maura Clark, Ph.D, a state agency psychologist, reviewed Smith's file and completed a "Psychiatric Review Technique" and a "Mental Residual Functional Capacity Assessment." (Tr. 539-57.) Dr. Clark found that Smith had affective, anxiety-related, and substance addiction disorders. (Tr. 539.) Ultimately, Dr. Clark determined that Smith had the mental capacity to understand, remember, and follow detailed instructions; restricted her to work that involved brief, superficial interactions with fellow workers, supervisors, and the public; and opined that, within these parameters, she was able to sustain attention and concentration skills to carry out work-like tasks with reasonable pace and persistence. (Tr. 556.) A second state agency psychologist later affirmed this assessment. (Tr. 553, 558.)

In February, Smith had another ten-minute medication management review with Ms. Lothamer. (Tr. 480.) Smith reported that her medications were working, except for the one treating her panic attacks, which were occurring daily. (Tr. 480.) Once again, Smith's mental status exam was relatively normal except for an anxious mood and flat affect. (Tr. 480-82.) Ms. Lothamer found her "symptomatic but stable." (Tr. 482.)

Five months later, in July 2009, Smith saw Ms. Lothamer again for a ten-minute medication management review. (Tr. 474.) This time, she appeared as a walk-in, stating that she had been without her medications for months and continued to have anxiety and mood changes. (Tr. 474.) Ms. Lothamer decided to try Abilify and low dose Klonopin. (Tr. 474; *see* Tr. 477.) On mental status exam, Smith's mood was depressed, anxious, and fluctuating; her thought content was normal but depressive; her behavior was distractible; and her affect was congruent and flat. (Tr. 475-76.) Ms. Lothamer noted that she was "much worse." (Tr. 477.)

In August, Smith saw Ms. Lothamer for a ten-minute medication management

8

appointment, reporting that all of her medications were working with no side effects or complaints. (Tr. 460.) On mental status exam, Smith's mood was depressed and her affect was congruent and flat; otherwise, her exam was normal. (Tr. 465-67.) Ms. Lothamer noted that Smith was "maintaining well and stable." (Tr. 468.)

Also in August, Smith tested positive for cannaboid (Tr. 461); she told a Park Center nurse that she smoked marijuana a couple of weeks before, but agreed not to smoke anymore (Tr. 462). A couple of weeks later, however, Smith admitted to continued marijuana use. (Tr. 459.)

In September 2009, Ms. Lothamer wrote a letter at Smith's request about how her dog affected her psychiatric situation. (Tr. 457.) According to Ms. Lothamer, the dog served as a therapy animal and was necessary to Smith's mental stability. (Tr. 457.)

Ms. Lothamer then met with Smith the following month for a ten-minute medication management appointment. (Tr. 452.) On mental status exam, Ms. Lothamer's findings were normal expect for a fluctuating, but euthymic, mood. (Tr. 453-54.) She further stated that Smith was "maintaining well and stable" and continued her medications as before. (Tr. 455.) In November, Smith called Park Center, reporting that she was feeling depressed, had been constantly crying for the past two months, and was having difficulty staying asleep; she denied suicidal ideation. (Tr. 450-51.) Ms. Lothamer was consulted, and Zoloft was added. (Tr. 451.)

The next month, December 2009, Ms. Lothamer completed a medical source statement and "Mental Impairment Questionnaire" on Smith's behalf. (Tr. 445-49.) In the medical source statement, Ms. Lothamer concluded that Smith had no useful ability to perform sixteen of twenty-two mental work-related activities and could satisfactorily perform the remaining six

9

activities only some of the time.  (Tr. 445-46.)  In the questionnaire, Ms. Lothamer indicated that

she saw Smith with a "frequency consistent with accepted medical practice for the type of

treatment and/or evaluation required" for her conditions and assigned Smith a current GAF score

of 55 and a highest-past-year GAF of 50.  (Tr. 447.)  Ms. Lothamer further opined that Smith

would miss more than four days of work a month due to her impairments or treatment.  (Tr. 449.)

Ms. Lothamer also saw Smith later that month for a ten-minute medication management

review.  (Tr. 565-69.)  Smith reported that her depression had improved immensely since starting

Zoloft, but that she still had some sleep issues.  (Tr. 565.)  The only negative finding on mental

status exam was a depressed mood.  (Tr. 565-67.)  Ms. Lothamer again found that Smith was

"maintaining well and stable."  (Tr. 568.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard.  *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).  Where the Commissioner's decision "lacks evidentiary support or is so poorly

articulated as to prevent meaningful review, the case must be remanded."  *Brindisi ex rel.*

*Brindisi v. Barnhart*, 315 F.3d 783, 785 (7th Cir. 2003) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's.  *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive.  *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision.  *Clifford*, 227 F.3d at 869.

## IV.  ANALYSIS

### A.  *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5)

whether the claimant is incapable of performing work in the national economy.[6]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner.  *Clifford*, 227 F.3d at 868.

## B.  The ALJ's Decision

On September 27, 2010, the ALJ rendered his decision.  (Tr. 32-46.)  At step one of the five-step analysis, the ALJ found that Smith had not engaged in substantial gainful activity since her alleged onset date.  (Tr. 34.)  The ALJ then concluded at step two that Smith suffered from the following severe impairments: major depressive disorder/bipolar disorder, panic disorder, history of alcohol dependence in reported remission, and cannabis abuse/dependence.  (Tr. 35.)  Nonetheless, at step three, the ALJ determined that Smith's impairment or combination of impairments did not meet or medically equal a listing.  (Tr. 36-38.)  Before proceeding to step four, the ALJ determined that Smith's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to unskilled work (i.e., understanding, remembering, and carrying out simple, routine

---

[6] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

tasks and sustaining those tasks for an eight-hour workday); requires a flexible work
pace; only brief and routine interactions with others; and, would work best alone, in
semi-isolation, or as part of a small group.

(Tr. 38.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that Smith
was able to perform her past relevant work as a hand packager.  (Tr. 45.)  The ALJ then found at
step five that Smith could perform a significant number of other unskilled jobs within the
economy.  (Tr. 45-46.)  Thus, Smith's claims for DIB and SSI were denied.  (Tr. 46.)

### C. The ALJ's Consideration of Ms. Lothamer's Opinion
### Is Supported by Substantial Evidence

In her appeal, Smith argues that the ALJ's discounting of the opinion of Karen Lothamer,
a psychiatric clinical nurse specialist at Park Center, was not supported by substantial evidence.
Although the ALJ's reasoning is admittedly flawed in some respects, none of Smith's challenges
necessitate a remand of the ALJ's decision.

To review, in December 2009, Ms. Lothamer opined, among other things, that Smith
would miss more than four days of work per month (Tr. 449), which, according to the VE's
testimony, would preclude competitive employment (Tr. 95), and that Smith had no useful
ability to function in sixteen of twenty-two areas of mental work-related activities and could
perform the remaining six activities satisfactorily only some of the time (Tr. 445-46).  The ALJ
assigned no weight to Ms. Lothamer's opinion concerning Smith's level of incapacity because
(1) her treatment records did not reflect the level of symptoms suggested by these limitations; (2)
Smith improved throughout the period, responded to medication changes, and was seen only
infrequently; (3) no counseling or psychiatric care either occurred or appeared to be
recommended; and (4) the current GAF score of 55 she assigned was inconsistent with the level

13

of incapacity reflected in her medical source statement.  (Tr. 43.)  The ALJ then concluded that Ms. Lothamer's opinion was inconsistent with her own treatment records and, as such, could not be given more than minimal weight.  (Tr. 43.)

Ms. Lothamer, a clinical nurse specialist, is considered an "other source" under the regulations.  *See Furlow v. Astrue*, No. 10-554-CJP, 2011 WL 3555726, at *6 (S.D. Ill. Aug. 11, 2011); SSR 06-03p, 2006 WL 2329939.  Opinions from "other sources" should be evaluated using the applicable factors set forth in 20 C.F.R. §§ 404.1527 and 416.927 for weighing medical opinions from "acceptable medical sources."[7]  SSR 06-03p, 2006 WL 2329939.  However, "[n]ot every factor for weighing opinion evidence will apply in every case."  *Id*.  Therefore, "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case."  *Id*.

First, Smith argues that, in concluding that Ms. Lothamer's treatment records did not reflect the level of symptoms suggested by the limitations she imposed, the ALJ failed to recognize that bipolar disorder is episodic or to consider evidence in the Park Center records showing that Smith suffered from bouts of episodic depression.  (Opening Br. 18-19.)  In his decision, however, the ALJ spent over a page recounting Smith's treatment at Park Center, including her visits with Ms. Lothamer.  (*See* Tr. 40-42.)  The ALJ noted that Ms. Lothamer routinely found that Smith was "improved," "slightly better," or stable during their visits, but also acknowledged that Smith had periods during which she was "much worse," had mood

---

[7] These factors include the following:  (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  SSR 06-03p, 2006 WL 2329939.

changes, anxiety, and difficulty sleeping, and was depressed.  (Tr. 41-42.)  As such, the ALJ

implicitly recognized the episodic nature of Smith's conditions and adequately considered Ms.

Lothamer's treatment records.  And even though the ALJ did not mention *every* anxious or

depressed mood or flat affect that Ms. Lothamer observed while treating Smith or all of Smith's

complaints (*see* Opening Br. 19; Reply Br. 2), the ALJ is not required to mention every snippet

of evidence in the record; rather, he must connect the evidence to the conclusion without

ignoring entire lines of contrary evidence, *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012);

*see Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  In recognizing Smith's periods of

regression and difficulties along with her stable periods, the ALJ fulfilled that duty here.

Once the ALJ recounted the treatment Smith received at Park Center, he then concluded

that Ms. Lothamer's treatment records did not reflect the level of symptoms suggested by the

limitations she imposed in her medical source statement—that Smith had no useful ability to

perform almost all of the twenty-two mental work-related activities and a fair ability to perform

six of them.  (Tr. 43; *see* Tr. 445-46.)  Of course, an ALJ may discount an opinion that is

internally inconsistent or not supported by objective medical evidence, including a source's own

treatment notes.  *See Zblewski v. Astrue*, 302 F. App'x 488, 493-94 (7th Cir. 2008) (unpublished)

(affirming the ALJ's discounting of a nurse's opinion where it was inconsistent with the medical

evidence of record); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) (noting that "[m]edical

evidence may be discounted if it is internally inconsistent or inconsistent with other evidence");

*Windus v. Barnhart*, 345 F. Supp. 2d 928, 941 (E.D. Wis. 2004) (stating that it is proper for the

ALJ to consider whether the treating source's opinion is supported by objective medical

evidence, including his own treatment notes).

15

Here, while Ms. Lothamer sometimes observed on mental status exam that Smith's mood was anxious or depressed or her affect was flat (Tr. 466-67, 475-76, 480, 482, 489, 491, 499, 566), Ms. Lothamer never found any memory or orientation problems and noted that Smith's appearance was appropriate (though sometimes overweight), her judgment was usually "good and appropriate" (though Ms. Lothamer did note it as "fair" twice (Tr. 475, 490)), her thought content was normal, and her thought form was coherent (Tr. 453-54, 466-67, 475-76, 481-82, 490-91, 499-500, 513-14, 566-67). Yet, despite never finding significant problems with Smith's appearance, memory, orientation, judgment, thought content, or thought form, Ms. Lothamer concluded that she had only a "fair ability" to *remember* locations and work-like procedures; to understand and *remember* short, simple instructions; and to adhere to basic standards of *neatness* and *cleanliness* and no useful ability whatsoever to understand and *remember* detailed instructions; make simple work-related decisions; maintain socially appropriate behavior; respond appropriately to changes in the work setting; or be aware of normal hazards and take appropriate precautions, just to name a few. (Tr. 445-46.) Accordingly, the ALJ's decision to discount Ms. Lothamer's opinion concerning Smith's extreme limitations because it was inconsistent with her own treatment notes is supported by substantial evidence. *See Elkins v. Astrue*, No. 4:10-cv-74-WGH-RLY, 2011 WL 2728398, at *11 (S.D. Ind. July 11, 2011) (affirming ALJ's decision not to give controlling weight to a treating doctor's opinion when the doctor's extreme findings were inconsistent with numerous other medical opinions and evidence in the record).

Smith next takes issue with the ALJ discounting Ms. Lothamer's opinion because Smith had improved throughout the period, responded to medication changes, and was seen only

16

infrequently.  (Opening Br. 19; Reply Br. 3.)  As to this first reason, during their visits, Ms.

Lothamer found that Smith was "maintaining well and stable" (Tr. 455, 468, 568), "improved"

(Tr. 500, 515), "slightly better" (Tr. 491), or "symptomatic *but stable*" (Tr. 482 (emphasis

added)).  Only once did Ms. Lothamer find her "much worse"; this was in July 2009 after Smith

had been off her medications for months.  (Tr. 474, 477.)  Once restarted on her medications,

Ms. Lothamer noted that Smith was "maintaining well and stable" in August, October, and

December of 2009.  (Tr. 455, 468, 568.)  As such, although Smith had some periods of

regression, according to Ms. Lothamer's own treatment records, she had improved throughout

the period, just as the ALJ stated.  And, as the ALJ also concluded, Smith responded to

medication changes as well.  In January 2009, Ms. Lothamer adjusted Smith's medications (Tr.

489), and the following month, Smith reported that most of her medications were working (Tr.

480).  Ms. Lothamer adjusted Smith's medications again in July 2009 (Tr. 474), and a month

later, Smith reported that they were working without side effects or complaints (Tr. 465).

Finally, Zoloft was added in November 2009 (Tr. 451), and Smith stated in December that her

depression had improved immensely since starting it (Tr. 565).

Smith does not dispute the ALJ's characterization, but contends that there is a great

difference between responding to treatment and being able to enter the workforce.  (Reply Br. 3

(citing *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011)).)  Unlike in *Scott*, 647 F.3d at 740,

however, the ALJ's analysis does *not* reveal "an all-too-common misunderstanding of mental

illness" because, rather than focusing on a "single notation that [Smith] [was] feeling better or [ ]

had a 'good day'" to imply that her condition was treated, the ALJ relied on the findings of Ms.

Lothamer, who actually examined Smith and typically found her condition improved, stable, or

slightly better, to determine that she improved with treatment and responded to medication changes. Moreover, the ALJ does not use Smith's improvement or responsiveness to medication to conclude that she was able to enter the workforce; rather, he uses it as one reason why Ms. Lothamer's extreme limitations were not supported by her own treatment records. As such, this argument fails to warrant a remand.

Not to be deterred, Smith maintains that the ALJ "played doctor" when he found that Smith's seven appointments with Ms. Lothamer over fifteen months were "infrequent." (Reply Br. 3.) First, the record reflects that Ms. Lothamer saw Smith eight times between May 2008 and December 2009, a period of seventeen months. (Tr. 452-56, 465-69, 474-78, 480-84, 489-93, 499-502, 513-16, 565-69.) During this period, Ms. Lothamer saw Smith once for a fifteen-minute insight therapy session (Tr. 513) and seven times for medication reviews that lasted no more than ten minutes each (Tr. 452, 465, 474, 480, 489, 499, 565). Thus, over 17 months, Ms. Lothamer saw Smith for a total of merely 85 minutes, which supports the ALJ's conclusion that Smith was seen only "infrequently," even despite Ms. Lothamer's representation that she saw Smith with the frequency consistent with accepted medical practice. *See Lee v. Astrue*, No. 1:12-CV-00038, 2012 WL 6681715, at *10 (N.D. Ind. Dec. 21, 2012) (finding that the ALJ's conclusion that the claimant received very limited treatment from a source was reasonable when the source saw the claimant seven times over two and a half years). The ALJ was not "playing doctor" in this regard, but only fulfilling his duty to consider how frequently Ms. Lothamer saw Smith. *See* SSR 06-03p, 2006 WL 2329939.

Furthermore, taking a broader view of Smith's treatment history, Smith alleged disability as of March 1, 2005. Therefore, when Ms. Lothamer's eight visits are considered over the

18

entirety of Smith's claimed disability period—over four and a half years from her alleged onset date to her last visit with Ms. Lothamer—the ALJ's conclusion that Smith "was seen only infrequently" is reasonable.  This is particularly true when, as the ALJ noted, Smith received no treatment whatsoever between December 2005 and April 2008 (Tr. 41), a period of over two years.  Accordingly, a remand is not warranted on this basis either.

In attacking the ALJ's next reason for discounting Ms. Lothamer's opinion—that no psychiatric care or counseling either occurred or appeared to be recommended—Smith first argues that she *did* receive psychiatric care from Ms. Lothamer.  (Opening Br. 20.)  As Smith points out, Ms. Lothamer described herself as a *psychiatric* clinical nurse specialist (Tr. 457, 498), prescribed medication subject to the approval of Larry Lambertson, MD, and Vijoy Varma, MD, presumably both of whom are psychiatrists (*see* Tr. 478 (where Ms. Lothamer's medication change was approved by Dr. Lambertson), 493 (where Ms. Lothamer's medication change was approved by Dr. Varma)) and had at least some of her treatment notes reviewed and approved by Dr. Varma (Tr. 484, 516, 569).  This would appear to constitute some psychiatric care.  The ALJ was certainly aware that Smith was prescribed medications, as he referenced them several times throughout his decision (Tr. 39, 41-43), but, for whatever reason, did not consider this psychiatric care.  Regardless, beyond medications, there is no evidence that Smith received any other kind of psychiatric care, and the ALJ's possible misunderstanding or disagreement about what constitutes "psychiatric care" does not necessitate a remand.

Similarly, contrary to the ALJ's statement that no counseling appeared to be recommended for Smith, the record does contain some evidence that therapy or counseling was discussed and recommended.  (*See* Tr. 487-89.)  In January 2009, Ms. Lothamer offered Smith

"therapy for relaxation," to which Smith agreed (Tr. 489), and her case was subsequently assigned to Jennifer Nuce, an intern, for counseling (Tr. 487-88). But, as the ALJ noted, there is no indication that any such therapy or counseling actually occurred. As such, the ALJ's failure to find these somewhat buried references to counseling does not warrant a remand, especially when the ALJ correctly concluded that Smith never received such counseling. *See Bacidore v. Barnhart*, No. 01 C 4874, 2002 WL 1906667, at *10 (N.D. Ill. Aug. 19, 2002) (citation omitted) ("Not every mistake by an ALJ so undermines a determination that it cannot be said to be supported by substantial evidence.").

Nevertheless, Smith continues on with this argument, acknowledging that she never received counseling, but speculating that the reason this counseling did not occur may have been due to the budget cutbacks experienced by public mental health agencies. (Opening Br. 20; *see* Reply Br. 4.) "Speculation is, of course, no substitute for evidence," *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999), and at this step, Smith, who is represented by counsel, bears the burden of proving she is disabled, *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *see also Glenn* v. *Sec'y Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."). Thus, Smith's mere speculation that there *was* a reason why she did not receive counseling, and her additional speculation about what that exact reason was, does not justify a remand. Rather, in recounting Smith's medications and noting that she had not received counseling, the ALJ was simply considering the course of treatment that Smith was prescribed in determining the weight to assign to Ms. Lothamer's opinion, which he was permitted to do. *See Thomas v. Astrue*, No.

1:11-cv-00355, 2012 WL 5183574, at *7 (N.D. Ind. Oct. 18, 2012); 20 C.F.R. §§
404.1527(c)(2), 416.927(c)(2) (articulating that the ALJ may consider "the treatment the source
has provided and the kinds and extent of examinations and testing the sources has performed or
ordered from specialists and independent laboratories" when deciding the weight to assign to a
medical opinion).

In her penultimate argument, Smith contends that the ALJ misunderstood the concept of
a GAF score when he found the GAF of 55 that Ms. Lothamer gave to Smith in her December
2009 medical source statement inconsistent with the level of incapacity also reflected in that
opinion.  (Opening Br. 20.)  According to Smith, because bipolar disorder is episodic, the mere
fact that her symptoms of functioning were only moderate at one exam was not inconsistent with
that disorder; rather, the ALJ should have considered the highest-past-year GAF that Ms.
Lothamer assigned, which was a 50, as this score was more representative of her overall
functioning.  (Opening Br. 20-21.)  In his decision, while relying on the current GAF score of 55
that Ms. Lothamer assigned, the ALJ admittedly did not mention that Ms. Lothamer also
assigned this lower highest-past-year GAF score.  But "GAF scores are more probative for
assessing treatment options rather than determining functional capacity and a person's
disability." *Curry v. Astrue*, No. 3:09-cv-565 CAN, 2010 WL 4537868, at *7 (N.D. Ind. Nov. 2,
2010).  As such, "nowhere do the Social Security regulations or case law require an ALJ to
determine the extent of an individual's disability based entirely on his GAF score." *Denton v.
Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation and internal quotation marks omitted); *accord
Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011) (unpublished).  Accordingly, the ALJ's
mere failure to mention the highest-past-year GAF does not, by itself, necessitate a remand.

21

As Smith correctly points out, however, a GAF score between 41 and 50 reflects serious symptoms or a serious impairment in social, occupational, or school functioning, while a GAF score of 51 to 60 reflects only moderate symptoms or moderate difficulty in social, occupational, or school functioning.  AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  Therefore, the difference between a current GAF of 55 and a highest-past-year GAF of 50 appears notable.  But a GAF score of 50 falls at the very top of the range indicating serious symptoms or limitations, just below the range of scores for moderate impairments, suggesting that this difference may not be that significant.

Smith, however, argues that this difference *is* significant because, according to *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010), a GAF score of 50 does not support a conclusion that a claimant is mentally capable of sustaining work.  (Opening Br. 21.)  But *Campbell* is readily distinguishable from the instant case.  In *Campbell*, 627 F.3d at 302-05, 308, the claimant was assigned a GAF score of 50 by his treating psychiatrist, who never gave him a GAF rating higher than 50.  Here, however, Ms. Lothamer was an "other source," rather than an acceptable medical source, and she *did* assign Smith a GAF higher than 50—the current GAF of 55 in December 2009.[8]  As such, although the ALJ could have more fully supported his discounting of Ms. Lothamer's opinion by explicitly addressing the highest-past-year GAF of 50 she assigned to Smith, his failure to do so is not enough to justify a remand, particularly when the ALJ provided other good reasons for discounting Ms. Lothamer's opinion.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (concluding that an error is harmless when it "would not affect

---

[8] Moreover, December 2009 was not the only time that Smith was assigned a GAF score of 55.  In January 2009, a Park Center treatment plan, which notes Ms. Lothamer as a member of the team, also assigned Smith a current GAF of 55.  (Tr. 485.)

the outcome of the case"); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("[N]o

principle of administrative law or common sense requires us to remand a case in quest of a

perfect opinion unless there is reason to believe that the remand might lead to a different

result."); *Susalla v. Astrue*, No. 1:11-CV-00164, 2012 WL 2026268, at *10 (N.D. Ind. June 5,

2012) (finding that, because the ALJ provided several other "good reasons" to discount a treating

source's opinion, one misstep did not warrant a remand).

Finally, Smith maintains that the ALJ "cherry-picked" the Park Center treatment records,

ignoring statements in evaluations or treatment plans that Smith had difficulty maintaining a job

and problems with attendance, productivity, getting along with others, and punctuality, among

other difficulties.  (Opening Br. 21; Reply Br. 5.)  But, as already discussed, the ALJ spent over

a page recounting the Park Center treatment records.  (*See* Tr. 40-42.)  And while he did not

explicitly mention or make a written evaluation of every notation or statement contained in these

records, he was not required to do so, and the statements Smith points to hardly amount to an

entire line of evidence that the ALJ ignored.  *See Arnett*, 676 F.3d at 591; *Herron*, 19 F.3d at

333.  As such, this argument is also unsuccessful.

Ultimately, the ALJ discounted Ms. Lothamer's opinion because it was inconsistent with

her own treatment records.  (Tr. 43.)  Although the ALJ's rationale in reaching this conclusion

has a few flaws, perfection is not necessary, *see Fisher*, 869 F.2d at 1057, and none of Smith's

various challenges to this decision rise to the level of warranting a remand.  Therefore, because

the ALJ's decision to discount Ms. Lothamer's opinion is supported by substantial evidence, it

will be affirmed.  *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court's]

task is limited to determining whether the ALJ's factual findings are supported by substantial

evidence.").

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The

Clerk is directed to enter a judgment in favor of the Commissioner and against Smith.

SO ORDERED.

Enter for this 28th day of January, 2013.

S/Roger B. Cosbey         
Roger B. Cosbey,
United States Magistrate Judge

.